USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 16, 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
:
UNITED STATES OF AMERICA                                        :
:
:
:
                   -v-                                          :    17-cr-130 (KBF)
:
JOHNATHAN TIMMS,                                                :    OPINION & ORDER
:
                              Defendant.                        :
-------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

On February 27, 2017, Johnathan Timms was indicted for the crime commonly known as "felon in possession." The charge against him arises from an arrest that occurred following a fast-paced street encounter with police officers on October 27, 2016. Before the Court is defendant's motion to suppress the loaded semi-automatic pistol seized during a search that that he asserts violated his rights under the Fourth Amendment to the U.S. Constitution. (ECF No. 11.)

Because there were contested issues of fact—in particular, whether the officers had reasonable suspicion to conduct a <u>Terry</u> stop, and whether the stop ripened into an arrest without probable cause—the Court held an evidentiary hearing on August 3, 2017. At that hearing, the Government called two officers to testify in support of the lawfulness of the search and seizure. By stipulation, the Court also received eight exhibits, including a videotape (no audio) of a portion of the incident, a 911 call, a photograph of the defendant taken at the time of his arrest, and a videotape (with audio) of the defendant's post-arrest statement.

For the reasons set forth below, the Court finds that the officers acted well within their authority, and that the search and seizure were lawful and appropriate under the circumstances. Accordingly, defendant's motion to suppress is DENIED.

I.   FACTS[1]

After 11 p.m. on October 27, 2016, a civilian ("Witness") who had been speaking on a cellphone with 911, approached police officer Brandon Ravelo ("Officer Ravelo")[2] in the vicinity of Grand Concourse and East 184th Street in the Bronx, New York. At that time, Officer Ravelo had been reaching into the trunk of an unmarked police vehicle to retrieve something; three other officers with whom Ravelo had been on patrol that night were in the vehicle at the time. (Tr. of Evid. Hr'g ("Tr.") 11, Aug. 3, 2017.)

The Witness told Officer Ravelo that he was on the phone with 911 and that he had been walking behind two individuals when he overheard them stating that one of them had a gun and they were going to kill someone.[3] The Witness also told Officer Ravelo that one of the individuals was wearing red and the other was wearing black, but he did not provide any other physical description. (Tr. 12, 13.)[4] The Witness further informed Officer Ravelo that the two men were located around

---

[1] The Court makes its findings of fact based upon a preponderance of the evidence.
[2] As of October 27, 2016, Officer Ravelo had been with the N.Y.P.D. for approximately eight years. (Tr. 8) He was working in the Strategic Response Group ("SRG") of the Citywide Anticrime unit. (Tr. 9.) Prior to October 27, 2016, Officer Ravelo had experience dealing with incidents involving firearms and arrests involving more than a single firearm. (Tr. 62-63.)
[3] Officer Ravelo testified that he did not recall the precise words that the Witness said to him. (Tr. 66.) His best recollection was that the words conveyed two important facts: that one of the individuals was armed and that one had expressed an intent to kill someone. (Tr. 11, 19, 55, 58.) The Court credits Officer Ravelo's testimony that the Witness told him he overheard one of the individuals say, in substance, that he was armed with a gun.
[4] The Witness had provided the 911 operator with additional physical characteristics, but the Court credits the Officer Ravelo's testimony that he was not provided with any additional description.

2

the corner of Grand Concourse and 184th Street and were heading southbound. (Tr. 13.) The Witness appeared to be agitated and his voice was elevated. (Tr. 11.)

Based on the overall circumstances, Officer Ravelo acted reasonably in crediting the Witness and taking further steps. Officer Ravelo testified that based on the combination of his experience, the Witness's demeanor, and the fact that the Witness was on the phone with 911 (and had showed Officer Ravelo the display on his cellphone that corroborated this), he believed the Witness was being truthful. (Tr. 18, 19-20.) Officer Ravelo also viewed the situation as requiring immediate action.

Officer Ravelo alerted the three other officers who were still in the unmarked police vehicle to what he had been told. (Tr. 13.) He and two of the officers, Officer Assade and Sergeant Rodenas, proceeded in a staggered fashion (with several feet between them) around the corner of 184th Street and onto Grand Concourse, heading southbound. Another officer, Sergeant Tosado, drove the unmarked police vehicle in the same direction. (Tr. 13-14.)

As Officer Ravelo turned the corner onto Grand Concourse, he saw several individuals standing in a cluster in the middle of the sidewalk approximately 30 yards ahead. (Tr. 16, 17, 32-33.) Officer Ravelo could hear the individuals arguing. (Id.) Both Officer Ravelo and Sergeant Rodenas saw body movements that indicated that the argument was heated—Officer Ravelo described the individuals as "face to face, real close to each other" (Tr. 16, 30), and Sergeant Rodenas described the individuals as "loud, boisterous, argument, combative, a lot of hand

3

gestures." (Tr. 75.) Several bystanders had gathered nearby and were staring at the individuals who were arguing. (Tr. 16, 28.)

Officer Ravelo was in the lead as the three officers approached the group. (Tr. 14.) He observed that the defendant was wearing a black hoodie and a winter coat. (Tr. 17, 29.) Based upon his observations and the information he received from the Witness, Officer Ravelo believed that the men described by the Witness were among those in the group on the sidewalk, and that "possibly somebody was going to get shot." (Tr. 17.) When Officer Ravelo was within approximately ten feet of the group, Sergeant Tosado pulled up parallel to them in an unmarked police vehicle. (Tr. 20.) At that point, the individuals in the group appeared to notice the car and began to separate. Officer Ravelo described the group as starting to "scatter."[5] Seeing this, Officer Ravelo increased his pace and identified himself to the group as "police." (Tr. 21.) Immediately thereafter, Officer Ravelo saw one of the men in the group grabbing his waistband. (Tr. 43, 44.) This motion is corroborated by the videotape of the encounter (and is visible when the tape is advanced on a frame by frame basis). Seeing this movement, Officer Ravelo pulled out his service weapon and told the man to put his hands up. (Tr. 21.) This sequence of events is also corroborated by a frame by frame review of the videotape (shortly after 11:23:19).

---

[5] On cross-examination, counsel for defendant Timms attempted to undermine Officer Ravelo's reference to the individuals "scattering." (Tr. 51-53) However, defense counsel played the videotape that captures this portion of the encounter, and the Court has watched it again on a frame by frame basis multiple times since; it is clear that while events were fast moving, there was a correlation between the car pulling up alongside the group and the group appearing to become aware of that fact and starting to move apart.

4

Officer Ravelo testified credibly that based on the totality of circumstances, he believed that the individual who had grabbed his waistband could be armed. Shortly thereafter, he saw a small knife fall from the pants of the individual who had grabbed for his waistband. (Tr. 43, 44.)[6] Officer Ravelo was focused on that individual[7] when he heard Sergeant Rodenas indicate that he had recovered a gun. (Tr. 23.) Sergeant Rodenas testified that as he approached the group and heard Officer Ravelo tell the individuals to put their hands up, he saw a slight movement of the defendant's right arm that caught his attention. (Tr. 81.) This arm movement is also corroborated by the videotape when played on a frame by frame basis (shortly after 11:23:20).

Sergeant Rodenas's[8] testimony was consistent in all material respects with that of Officer Ravelo. He testified that Officer Ravelo relayed to the officers in the unmarked police vehicle what the Witness had told him, including that the Witness overheard two men, one wearing red and one black, discuss shooting somebody. (Tr. 73.) Sergeant Rodenas also testified credibly that as he turned the corner onto Grand Concourse, he could hear the group of individuals involved in a loud argument. (Tr. 75-76.) As he approached the group, Sergeant Rodenas saw that one of the individuals was wearing a red article of clothing and another was

---

[6] At one point, Officer Ravelo leaned down to pick the knife up off the ground. (Tr. 48.) This movement is captured on videotape and further corroborates Officer Ravelo's version of events (shortly after 11:24:06). The knife was not, however, vouchered.

[7] The individual that Officer Ravelo was focused on was not obeying officer instructions and Officer Ravelo had to grab both of his arms. This struggle is also corroborated on a frame by frame review of the tape.

[8] As of October 27, 2016, Sergeant Rodenas was also part of the SRG for Citywide Anticrime. He testified that the duties of that group are, in part, to combat street-level gun violence. (Tr. 71.)

5

wearing a black article of clothing. (Tr. 76.) Based upon the information known to him and his personal observations, Sergeant Rodenas thought that a fight might be imminent and that someone could be armed. (Tr. 76-77.) To the extent he was able to observe it and was focused on it, Sergeant Rodenas's description of Officer Ravelo's actions is consistent with Officer Ravelo's.[9]

Sergeant Rodenas testified that very quickly after Officer Ravelo had pulled his weapon, he and the other officers converged on the group and led them a few feet away to a storefront. (Tr. 78.) Sergeant Rodenas had previously noted that when Officer Ravelo told the individuals to put their hands up, one individual made a grabbing motion towards his waistband. (Tr. 81, 103, 104-05, 106, 108.) (As stated above, this is corroborated in one frame of the videotape shortly after 11:23:19.) As the defendant was moved towards the storefront, Officer Assade had his weapon drawn. (Tr. 108-09.) Once the defendant was against the storefront, Sergeant Rodenas frisked him twice—during an initial frisk, he felt that the defendant pushed his waist forward towards the storefront, so Sergeant Rodenas conducted a second frisk. (Tr. 79-80.)

Based on the totality of circumstances, including the information he had received about what the Witness had told Officer Ravelo (some of which—including

---

[9] Sergeant Rodenas testified that he never saw a knife and was never made aware of the presence of a knife. (Tr. 94.) This does not cause the Court to doubt the veracity of Officer Ravelo's testimony. There is no necessary reason why Sergeant Rodenas would have been aware of the knife insofar as his attention was occupied with a frisk that had revealed a loaded firearm; moreover, the arrest of the other individual was for an outstanding warrant and not possession of the knife. The importance of the knife is (1) that its discovery was preceded by a grabbing of a waistband that caused Officer Ravelo to pull his gun, and (2) that when it dropped to the ground it corroborated Officer Ravelo's concern that the individual had had a concealed weapon.

the color of clothing and the location of the individuals involved in a heated argument—had by that point been corroborated), Sergeant Rodenas believed the defendant could have had a firearm. (Tr. 79.) During the second frisk, Sergeant Rodenas noticed that the defendant was again moving his body towards the storefront. This caused Sergeant Rodenas to pull the defendant back and reach around his waist. It was at this point that Sergeant Rodenas felt a bulge and discovered the firearm. (Tr. 80.) He then used the code phrase "I got lunch" to notify the other officers that he had discovered a firearm. (Tr. 83.) Following this discovery, the defendant was placed on the ground, searched for additional weapons, and handcuffed. He was restrained at this time by two officers, one with a knee on his back and another with a foot on his upper shoulder (beginning at 11:24:30).

Following his arrest, the defendant was interviewed on videotape. During that interview, he conceded that the group of individuals had been in an argument at the time the officers had approached them, though he also stated that it had been his nephew's "beef," not his own. (GX 4.)

II. LEGAL PRINCIPLES

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; Kentucky v. King, 563 U.S. 452, 459 (2011). "Our fundamental inquiry in considering Fourth Amendment issues is whether or not a search or seizure is reasonable under all the circumstances." U.S. v. Chadwick, 433

7

U.S. 1, 9 (1977); U.S. v. Bailey, 743 F.3d 322, 331 (2014) (citing Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652 (1995)) ("'The ultimate measure' of the constitutionality of a government search or seizure is 'reasonableness.'")  In most instances, the touchstone of a constitutional search is one conducted pursuant to a judicially authorized warrant, or resulting from probable cause.  Chambers v. Maroney, 399 U.S. 42, 51 (1970) ("In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution.  As a general rule, it has also required the judgment of a magistrate on the probable-cause issue and the issuance of a warrant before a search is made.")  However, there are judicially created exceptions.  Pertinent here is the exception crafted by the Supreme Court in Terry v. Ohio, 392 U.S. 1 (1968).  In Terry, the Supreme Court held that under certain circumstances, determined on a case by case basis, the temporary detention and limited search of a person based on reasonable suspicion alone could be constitutional.  Id. at 24.

Critical to the Supreme Court's holding in Terry was a recognition that police work may involve street encounters that necessitate temporary detention and limited searches to ensure the police or the public's safety.  The Supreme Court noted, "Street encounters between citizens and police officers are incredibly rich in diversity.  They range from wholly friendly exchanges . . . to hostile confrontations of armed men involving arrests, or injuries, or loss of life." Id. at 13.  The Supreme Court continued, "Moreover, hostile confrontations are not all of a piece.  Some of

8

them begin in a friendly enough manner, only to take a different turn upon the injection of some unexpected element . . . ." Id. The Supreme Court articulated the question before it as a narrow one: "whether it is always unreasonable for a policeman to seize a person and subject him to a limited search for weapons unless there is probable cause for an arrest." Id. at 15. To make a reasonableness determination, a court must first determine the point in time at which Fourth Amendment rights are brought into play. Id. at 16. That is, whether and when a defendant has been "seized"; and whether and when a defendant has been searched. Id. The Court stated, "we deal here with an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." Id. at 20. Moreover, once there is reasonable suspicion to investigate through temporary detention,

> there is [an] immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives. In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest.

Id. at 23-24. "In evaluating whether an investigative stop is reasonable under the Fourth Amendment, the reviewing court must determine 'whether the officer's

9

action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" U.S. v. Alexander, 907 F.2d 269, 272 (citing Terry, 392 U.S. at 20). The first step in such an analysis is to determine whether there is reasonable suspicion to believe that the individual is engaged in illegal activity. U.S. v. Arvizu, 534 U.S. 266, 273 (2002). Reasonable suspicion requires more than a mere "hunch;" rather, it demands "specific and articulable facts" and a "particularized and objective basis" to suspect illegal conduct. Terry, 392 U.S. at 21, 27; Arvizu, 534 U.S. at 273; U.S. v. Freeman, 735 F.3d 92, 96 (2d Cir. 2013). Officers may still draw upon their "own experience and specialized training to make inferences from and deductions about the cumulative information available to them." Arvizu, 534 U.S. at 273.

A reviewing court will look at the "totality of the circumstances" when determining whether there was a reasonable suspicion to support a Terry stop. Bailey, 743 F.3d at 333. The standard for a reasonable suspicion is "not high." See Richards v. Wisconsin, 520 U.S. 385, 394-95 (1997) (citing Terry, 392 U.S. at 30, and describing the standard for reasonable suspicion in the context of a no-knock search). It is "less demanding than probable cause," and only requires sufficient facts to reasonably suspect that criminal activity "'*may* be afoot.'" U.S. v. Singletary, 798 F.3d 55, 60 (2d Cir. 2015) (quoting Terry, 392 U.S. at 30) (emphasis in original). Furthermore, the Constitution "does not demand that all possible innocent explanations be eliminated before conduct can be considered as part of the totality of circumstances supporting a reasonable basis to believe that criminal

10

activity may be afoot." <u>Singletary</u>, 798 F.3d at 61 (quoting <u>Bailey</u>, 743 F.3d at 333) (holding that although carrying an object that was the "standard size of a beer" can could have also been a soft drink, the totality of the circumstances and the officer's experience supported a reasonable suspicion that it was beer).

"There are no hard and fast rules for evaluating the conduct of law enforcement agents conducting investigative stops. A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists." <u>Alexander</u>, 907 F.2d at 272 (internal citations omitted). On the other hand, when law enforcement officers exceed the bounds of permissible safeguards and thereby convert an otherwise legitimate investigative stop into a de facto arrest, probable cause is required. <u>Id.</u> at 272-73. Thus, even if articulable suspicion supports an investigatory stop and pat-down, the Fourth Amendment demands that the scope and duration of the detention be reasonable. <u>Bailey</u>, 743 F.3d at 336 (finding that a detention of less than ten minutes did not exceed constitutional limits under the circumstances). In <u>Bailey</u>, the Second Circuit found that it was "certainly within the reasonable scope of the initial stop and patdown for detectives (1) to remove hard objects from Bailey's pockets to ensure that they were not weapons . . . ." <u>Id.</u>

Reasonable suspicion should be based on more than an anonymous tip that lacks indicia of reliability. <u>Florida v. J.L.</u>, 529 U.S. 266, 270 (2000); <u>see also</u> <u>Freeman</u>, 735 F.3d at 98 (a pair of anonymous calls lacked sufficient indicia of

11

reliability upon which to base reasonable suspicion; nothing was known about the caller and no facts pointed towards reliability.)

III. DISCUSSION

Based on the totality of circumstances, the Court finds that the stop, search, and seizure in this case were well within the bounds of the Fourth Amendment. As an initial matter, the officers acted reasonably when they followed up on the information provided by the Witness. This was not the type of anonymous tip at issue in Florida v. J.L. or Freeman. In those cases, law enforcement acted on anonymous calls lacking predictive information made from an unknown location, and therefore the tips "lacked moderate indicia of reliability." Florida v. J.L., 529 U.S. at 271; Freeman, 735 F.3d at 98. In those cases, the officers receiving the tips had no information that allowed them to test the reliability of the informer. Here, the indicia of reliability existed. The information was provided by an individual who Officer Ravelo had a reasonable basis to believe was truthful. First, the Witness was on his cellphone with 911 when he approached Officer Ravelo. This provided some indicia that the Witness's information was not spontaneously made up, and that he was telling the truth. Second, Officer Ravelo was personally able to assess the Witness's demeanor and saw that the Witness exhibited indicia consistent with someone shaken by a conversation of the type he claimed he had overheard. Third, the Witness provided Officer Ravelo with the color of clothing the individuals were wearing and the direction they were travelling, providing further basis (if confirmed, as these details were) to believe him. Fourth, the Witness

12

conveyed to Officer Ravelo that there could be a fight, which was corroborated at the corner when Officer Ravelo and Sergeant Rodenas could hear loud voices arguing. Finally, as Officer Ravelo testified on cross-examination, the Witness was not attempting to slip anonymously away—Officer Ravelo was able to obtain his name and contact information following the incident. (Tr. 58-59.)

Thus, Officer Ravelo received information from a source that, based on his experience, had indicia of reliability; this information indicated that there could be a very dangerous situation right around the corner—one that could involve one or more firearms and a lethal grievance. Taken together, these circumstances make it reasonable for Officer Ravelo to report what he had heard to his colleagues and for them to proceed immediately to investigate. Indeed, it would have been poor police work had the officers acted differently.

This takes us to the point at which Officer Ravelo and Sergeant Rodenas approached the group of arguing individuals. As they approached the group, they proceeded cautiously, not knowing whether they were approaching armed and dangerous individuals. A crowd had developed near the arguing group and it was reasonable for the officers to take steps to insure their personal (and the crowd's) safety. As the officers approached, the loud arguing that they heard provided some confirmation that the Witness's information may have been correct. At the very least, it was appropriate for the officers to proceed with that as a possibility. As they got closer, the color of the clothing worn by two of the individuals was confirmed, lending further credence to the information provided by the Witness. At

13

this point, it would have been foolhardy for the officers to have ignored the possibility that one or more to the individuals could have been armed. While the Witness had only referred generally to a shooting or someone with a gun, that did not eliminate the possibility of more than one person with a gun. As the officers both testified, they had both experienced situations involving multiple firearms in the past. The officers clearly had articulable and now some corroborated facts to detain the group in a Terry stop.

As the officers approached and the patrol car pulled alongside, the videotape does show the group appearing to have become aware of that and moving apart. The videotape also shows the defendant with his back to the camera moving his right hand downwards. Sergeant Rodenas testified credibly that he saw this movement. (Tr. 81.) This action by the defendant raised a reasonable concern that the defendant needed to be monitored closely and might have a weapon.

The events involved in the stop and search then proceeded very quickly—within seconds, one individual can be seen on videotape grabbing his waist. In light of the other information received and confirmed by that point, it was reasonable for Officer Ravelo to be concerned about both his safety and the safety of the crowd. Under these circumstances, it was entirely reasonable for Officer Ravelo to require the individuals to raise their hands and move towards a location (the storefront, a few feet away) where a limited search, to ensure the safety of the officers and bystanders, could be performed. This limited search of each of the individuals is

14

precisely the type of precautionary search Terry anticipated might reasonably occur.

During this search, Sergeant Rodenas discovered the gun. Probable cause to arrest the defendant existed at least as of this moment. Therefore, when the defendant was subsequently further restrained on the ground, it was in the context of a lawful arrest.

In sum, the circumstances of what occurred on October 27, 2016, are well within the bounds of what the Supreme Court has indicated is constitutional law enforcement conduct.

Accordingly, the motion to suppress the firearm recovered during the search is DENIED.

The Clerk of Court is directed to terminate the motion at ECF No. 11.

SO ORDERED.

Dated:    New York, New York
           August 16, 2017

_____
    KATHERINE B. FORREST
    United States District Judge